Case number 24-1882 Thomas Schramm v. Neenah Paper Michigan Incorporated et al. All arguments not to exceed 15 minutes per side. Mr. Morrell, you may proceed for the appellant. Thank you, Your Honor. Good morning. Good morning, Your Honors. Tom Schramm worked for 30 years for Neenah Paper. He paid his dues to the USW for 30 years. When he needed his union, they didn't just abandon him, they were complicit in his termination. Union members are supposed to be better protected because of their membership. The USW actually harmed Tom Schramm. Their conduct was arbitrary and in bad faith. A jury deserves to determine the facts. So as the court knows, he was fired twice. The second time before he even had a chance to return to work. After his first termination was settled in October of 21, there were negotiations over issues such as back pay and the date. And that was set for January 3, 22 when he would return. The union was on his side at first, but then he turned against them. The two local presidents at the plant, Josh Trader and Mike Peters, began approaching the local HR rep with concerns about Mr. Schramm's return. They reported rumors to Hill, Kathy Hill, refused to divulge any names or sources. Hill wrote down the rumors. Those rumors included entirely baseless claims about a hit list and a workplace shooting. Hill did no other investigation, no interviews, nothing, and neither did the union. What was the list? A hit list is a little unfair to him, but there was a list. He acknowledged it, right? In May of 21. These were people he was going to improve his relationship with? Well, there's two references to a list in the record. In May of 21, when he was texting with Josh Trader, he was venting and he said, I would like to see some people be shown the door like I was. This was two weeks after we filed the whistleblower lawsuit. And Josh Trader actually responded by saying, yeah, and the plant manager should be hanged. I mean, it was May. I mean, it was nothing. So I don't think that had anything to do with anything because the rumors didn't start until October, according to everything in the record. In the return to work call, he said these are people I wanted to shake their hand, but he unequivocally said there was no hit list. And even despite all of the references in the record and the USW's brief and the declaration of Chris Haddock, used the term hit list, list 30 times among the various paperwork, there was never a citation to the record where anybody heard him say it or that there's a piece of paper or text or anything like that where he wished harm. The name hit list was not listed. But didn't he say that there were employees that he was concerned about or had problems with? Well, there's that text in May where he said, you know, those are people I'd like to see shown the door like I was. That's all. I mean, other than that, it was shop talk. You know, he says I'm frustrated with these people. I don't think they're concerned with safety at the plant. But at no point is anybody pointed to anything in the record where he threatened anybody with harm. And that's, you know, when I opened our brief, we talked about sort of a fanciful what would an arbitration look like? What witnesses would you put on if you were going to try to uphold the burden to terminate Tom Schramm? And there was no evidence whatsoever to do that. Wasn't it reasonable to interpret the what's in the wind comment as a threat? I do not believe so, Your Honor. And the reason I do that, because the quoted comment is actually that he said Chris Haddock knows what's in the wind. Chris Haddock knows, I want to quote it, but he referred to Chris Haddock knows what's in the wind for Cathy Hill. And I'm just going to let Chris deal with it when we get back. And you wouldn't reference, it's an entirely different interpretation when you talk about Chris Haddock knows, because what he was referring to, and he discussed it right after that, and it was the grievance that his replacement was going to file and get back pay. And two witnesses independently testified, yes, that was a meritorious grievance. It was going to cost the company a lot of money. And Chris Haddock even said immediately after that, he says, I know you didn't mean anything about it, Tom. And, you know, it's a statement that you can interpret one way, but if you're going to take the inference and interpret it in the light most favorable to the plaintiff, and you look at how Chris Haddock responded immediately afterwards, and you look at the context of that statement, and Chris even saying, yes, I will file the grievance after he made that statement, then you can infer that it's a non-threatening thing. And it's certain. I'm struggling a little bit with the facts here, because as soon as that comment was made on this. I'm sorry. Thank you, Your Honor. As soon as that comment was made on this termination call, Haddock immediately shut down the call, called Schramm back, and said, you've cut our feet out from under us. He did say that. And isn't that the actual explanation of the representative, that there is grave concern about this being a threat, and it cuts the feet out from under us in representing you because you made the threat orally to the company directly? Well, that's what the USW is saying. But again, he said, I will file a request for information and a grievance. And he filed a request for information, which was denied by the company. And that's significant, because Chris Haddock's declaration says, I had all the information I needed to make a decision. Yet when the request for information was denied, he, you know, when you look at his declaration, he's got a string of paragraphs that just say, I considered, I considered. Basically what he did was he changed his mind. And he changed his mind because he was upset with Tom Schramm. He didn't change his mind because he felt that the evidence supported a termination. And when we look at cases like, I think it's Ruzicka, it's a court of appeals case from 1975, that even where the employee's conduct was undisputed, in that case it was alcohol use and abusive language at work, the court of appeals said, you should have allowed an arbitrator to determine the punishment. It's a clear example of arbitrary and perfunctory handling of a grievance when you don't even file a step one grievance. I asked Chris Haddock in his deposition, when you are going to set about investigating a matter, what do you do? He says, I determine the facts as best as possible. Josh Trader, the union president, testified, I don't care if you're fired once, the second time, or the third time, you file a grievance every single time. But Chris Haddock told me, I'm handling it from here on out. And so I deferred to him. I assumed he was going to file the grievance. So here you have, not only do you have a failure to investigate. How do you deal with the standard of review? Maybe in my mind it's very high, it seems to me. And a lot of your arguments are premised on giving the benefit of the doubt to your client, where I would have thought the standard of review was giving the benefit of the doubt to the union. Right. So the standard of review, as the court knows, you can find for the employee or find a factual dispute for the employee if you find evidence of either arbitrary or bad faith conduct. You don't have to find both. What's your main line of argument here, arbitrary or bad faith? I think there's evidence of both. Give me your best argument. Which is your best one? Bad faith case or arbitrariness case? I think they're both strong arguments, and I'll just summarize both arguments. Arbitrariness is complete, utter failure to investigate. Complete, utter failure to file even a step one grievance. Bad faith because he was complicit in a termination. And that is not an insignificant fact. Right? Both Kathy Hill, the local HR rep, and Monica Howell, the national HR rep, testified that Chris Haddock supported the termination. And Kathy Hill then wrote to Monica Howell and said, geez, right after that, do you think maybe we can find a way to not bring him back? And you can make an argument. The inference from those exchanges is that the company decided, didn't decide to pull the trigger and change their mind about a return to work until Chris Haddock gave them the green light. That's bad faith. This may show quite a bit of ignorance about this area of the law. Sure. You can say it politely. I'm very ignorant about many aspects as well, Your Honor. Judge, you don't quite understand this. But if I were running a company and the union worked there, and I had somebody that I was struggling with for whatever reason, not your client but someone else, it's just bad vibes. They're not doing the job I'd like. They're not good for morale. I bring in the union person, whoever's head of the shop there, and I say, you know, this guy is really creating problems for the company. I want to talk to you before I – I prefer the word fire terminate. It seems pretty harsh. It's bad enough they lose their job. So I want to discharge this person. Is there anything wrong with doing that? And the union person says, you know, I see what you're saying, and I probably won't bring a grievance. I think the facts are more than that here. No, no, no, but forget your case for a second. Is there anything inherently wrong with doing that? It seems really sensible. Yes. It's a violation of the duty of fair representation. I represented labor unions for 20 years. And who did the violation, the employer by talking to the union or the union by saying ahead of time I probably won't file a grievance? Nothing wrong with the employer, you know, thinking about termination. But, again, here are the inferences. They didn't start thinking about violating the return-to-work deal until Chris Haddock gave them the green light. But having represented labor unions, I know that there are co-workers that other co-workers don't like, right? And, you know, sometimes they're even a pain in the butt. But that doesn't mean that they don't deserve the duty of fair representation. That doesn't mean that they don't deserve to get the union to discharge their obligation honestly and with good faith and non-arbitrarily. And when you look at the O'Neill case, the U.S. Supreme Court case in O'Neill, it says that in light of the factual and legal landscape that the union has this duty to not act arbitrarily, what were the facts here? There were no facts. You had rumors, suppositions, and subjective interpretations of things that didn't happen. And that's why we believe it. I guess what I'm looking at is what the standard is stated all the way since Vaca v. Sipes. The standard has been that the question is whether the union person had a sufficiently informed basis to rationally conclude that the grievance would be unlikely to succeed. Isn't that the standard that is? That's generally yes. But when you look at how that has been applied, when you look at cases such as Millstead, which the union accepted the company's information and didn't do an independent investigation. Wasn't most of this information garnished or brought together by the union representatives, Josh Trader and I think Michael Peters are the ones who did, as they usually do in grievance proceedings, the people on the ground collect the information and provide it to the union representative. Isn't that what happened here? Well, there's a question about the veracity of the information that they passed on, and there's a factual question about whether they were just passing on their own beliefs as opposed to what they were hearing on the floor, because we don't have any witnesses about who actually, we don't have any names or anything like that. But here's a significant fact, too, and I'd like the panel to think about this perspective. Nobody talked to Tom Schramm. When he was on this return-to-work call, he was completely blindsided. He was expecting, okay, we're going to discuss, you know, you're coming back, your shift, this and that, and nobody ever talked to him. You know, when you talk about these cases where, you know, Black versus Rider. Counsel, your red light's on. Do you want to just finish this point and then save the rest for rebuttal, or do you want to use your rebuttal time now? I'll finish this point and use the rest for rebuttal. Thank you. When you look at, like, Black versus Rider PIE, which, Your Honor, Judge Stranch argued, actually, the case said it was arbitrary to not interview a key witness and not to call that witness for as a witness, and the key witness here is Tom Schramm, and nobody even asked his side of the story. I'll reserve the rest for rebuttal. Thank you, Your Honors. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court, my name is Matt Lutwin, and I represent the United Steelworkers International Union. This case, under O'Neill, is one about judgment, the judgment of a union representative that a grievance contesting the termination of an employee for engaging in threatening conduct was unlikely to prevail at arbitration. As detailed in Mr. Haddock's declarations, there are three factors that principally, for him, decided that question about whether or not the union was likely to succeed at arbitration. Two of those factors involved Mr. Haddock's own observation of conduct by Mr. Schramm. That occurred on the December 28th phone call. Determinative, in Haddock's view, was Mr. Schramm's statements that Kathy Hill, the local HR representative, was afraid of him, and that something was in the wind for her when he returned to work. Immediately after those statements, Haddock ends the call. Out of curiosity, words like in the wind, hit list, are we talking physical safety or just more violent language, intimidation? It's a veiled threat. Yeah, but we're back to my question. What are we talking about? Is it physical safety or is it just he's loose language and very aggressive? We are talking about physical safety, Your Honor. Kathy Hill was afraid of Mr. Schramm. She told Haddock that she wanted no direct contact with him, and that was in October of 2021 in the months leading up to the termination on December 28th. So Mr. Haddock ends the call on December 28th, calls Mr. Schramm, and says immediately, I wish you hadn't said that, referring to the in the wind comment. It was a threat, and it probably cut our feet right off. As Mr. Haddock explains in his declaration, that statement made the grievance unwinnable. The second factor, also relating to Mr. Schramm's own words, when pressed by Monica Howe, the corporate vice president for human resources, on the December 28th call about the hit list allegation, Mr. Schramm lists five individuals and expresses animosity towards four of them. For Mr. Haddock, that confirmed that a list figured in Mr. Schramm's mind. It also confirmed, as had been reported, the five names that comprised it. And importantly, Mr. Haddock considered the animosity that Mr. Schramm expressed with respect to four of them, blaming Kurt Lindstrom for creating a hostile work environment, blaming Kathy Hill for rejecting his claim with respect to the hostile work environment, and blaming Brad Jones and Pat McDonald for lying and fabricating the basis of the first discharge. Haddock did consider Mr. Schramm's explanation, that he wanted to walk into the offices of those five employees, shake their hand, and try to put this behind them. But Mr. Haddock did not believe that that explanation would persuade an arbitrator. It is that judgment that is most important here. Just out of curiosity, I know what the standard review is, and I'm trying to figure out how high it is. Yes, Your Honor. Could you not file a grievance solely on the ground that the only evidence is that the other employees didn't like this person? It's just a pure personality conflict. No one likes him. It would be good for the company, this office, not to have him around anymore. But it's personality driven. It's no threats. It's no harassment. It's just they don't like him. Would you still win if you didn't file a grievance and that's really the only evidence that's out there as to why, you know, assume the person is somehow close to at will so they could otherwise do it? Sure. Sure. So we're setting aside here Schramm's own comments, the threat. No, it's not this case. I'm imagining a different case. Yeah, yeah. It would be very hard for, I think, a union to succeed in arguing that it rationally concluded that an employer had just cause to terminate someone merely because of personality conflicts with somebody. That would seem arbitrary.  What about the failure of the union rep to be honest on the termination call? Isn't that a problematic piece of evidence for you? It is not, Your Honor. And this is how we would explain the comment. I think what you're referring to is this is out of the blue for me. Based on Mr. Haddock's discussion with Monica Howe, who led the call on December 28th, the December 21 call, Mr. Haddock understood that the company was considering terminating Mr. Schramm. He expected on the December 28th call that Ms. Howe would provide more information, more specifics, and give Mr. Schramm an opportunity to explain his side. And this is detailed in Mr. Haddock's declaration. Instead, Ms. Howe starts the call by terminating Mr. Schramm. And it was to that that Mr. Haddock responded with this is out of the blue for me. And so that comment should not be construed as evidence of bad faith. Mr. Haddock has explained his surprise in his declaration on that point. So the third factor that Mr. Haddock considered in determining that a grievance was unlikely to succeed at arbitration was Ms. Howe's statement that the now corporate HR, corporate NINA, had a lot of proof of misconduct on the part of Schramm, including as it relates to threats about a hit list with five names on it. And that for Haddock at this point, he's considering what he had learned from the local union officers and from the local HR. So now Mr. Haddock is learning from corporate very similar information in essential respects to what he had already learned. For Mr. Haddock, things had come to be tied together at this point as far as the information relating to the discharge. And so at that point, Mr. Haddock is not ready just yet on December 28th to make a decision, but he was heavily impacted by what he had heard on the December 28th call, principally Schramm's own statements that we've discussed. At that point, a few days later, Mr. Haddock makes an information request to Monica Howe, asking for the names of individuals who had expressed the concerns and for statements. In response to that, Ms. Howe provides some bullet points, saying that an employee said that Mr. Schramm said he would return to raise hell at the facility, that Mr. Schramm had made comments about a five-person hit list, threatening comments, and that he had been instilling fear in employees. Ms. Howe says that she would neither provide names or further information out of concern for the safety of the employees. Now for Haddock, that echoed what he had heard from the local union officers. Beginning in the middle of October of 2021, he discussed with the local union officers about concerns that they were hearing from the floor. These are full-time employees for the union, Josh Trader, Michael Peters, and Greg Merck. They're on the floor. They work side-by-side with the employees. They had conveyed to Mr. Haddock that dozens of employees were afraid of Schramm and expressing concerns that he would cause violence upon his return to work and that he had been making comments about a five-person hit list. So Mr. Haddock found those local union officers to be reliable reporters about the state of affairs on the shop floor. And when Mr. Haddock asked them for the names of the reporting employees, at least Josh Trader, the local president for Mr. Schramm's local union, expressed that they were afraid to come forward. So Mr. Haddock considered the fear of the bargaining unit employees as the basis for them not wanting to be identified with respect to the concerns. Mr. Haddock also considered or determined that he did not need further information from Ms. Howe, from Nina, in order to make a rational decision. And what was the basis of that? As detailed in his supplemental declaration, the basis was that he no longer needed more information about the hit list because of Mr. Schramm's own comments. One, the listing of the five individuals who had been reported by the local union to comprise the hit list. Mr. Schramm affirmed that that figured in his mind, the five list, the five-employee list. And Mr. Haddock no longer needed confirmation about who was on it because of the identification by Mr. Schramm. And he no longer needed further proof that it was threatening because of the threat directed to Kathy Hill, who importantly had talked to Mr. Haddock in October of 2021 about how she was afraid of Mr. Schramm, that Mr. Schramm was asking through texts or phone calls about her whereabouts, and that she understood that he blamed her for his disputes about back pay calculations and for the first discharge. So at that point, Mr. Haddock decides this grievance is unlikely to succeed at arbitration. It's the kind of decision that union representatives make every day, and he decided not to file a grievance. I'll note that it is not the law that an employee has the right to have a grievance filed on his or her behalf. And okay, so I will address a few of the arguments that the appellant has raised. One is that there was no investigation. That is untrue. Mr. Haddock had discussed with the local union officers concerns that employees had raised about Mr. Schramm's conduct. As I mentioned, he had talked to Kathy Hill, local HR, about her concerns and what she understood and the reasons why she was afraid. And he talked to the corporate HR twice, once on December 21 and then again on December 28. He followed up those discussions with Ms. Howe with an information request. And he was on the December 28 call with Mr. Schramm when Mr. Schramm provides the explanation for the five-employee list. And right after that call on December 28, he talks to Mr. Schramm and listens to Mr. Schramm's explanation for the in-the-wind comment. And in including the information request in response to which he received summaries of certain statements, Mr. Haddock had information that he considered and largely that determinative information involved firsthand evidence, what Mr. Haddock heard from Schramm himself, and that is critical to Mr. Haddock's determination. So further investigation, while that may have led to a more perfect investigation, that's not the standard. The standard is whether or not Mr. Haddock had enough information to make a rational decision. And he did here. Counsel, I think we understand your argument. Okay. Great. Any other questions? Nope. Great. Okay. Thank you very much. Thank you very much. We'll hear rebuttal. Thank you, Your Honors. Yes, unions have discretion, but it has to be exercised fairly, objectively, rationally, in good faith, based on facts. Look at the facts at the time Chris Haddock had them, not his after-the-fact declaration that his attorneys helped him write after litigation started. He was dishonest in the call. He had the script. She read from the script. Haddock had that script for a week. That was the communications plan. He was not surprised. She read the script that he had. He lied to Tom's face after that call. For what it's worth, I represented labor unions for 20 years. Unions need guidance as to their responsibilities. They have an obligation to their dues-paying members. They have a responsibility to defend them against false charges. They have an obligation to investigate serious accusations, to interview the employee and other witnesses about those accusations, to at least let the member know the company is planning to terminate him and not conceal that information from the member and pretend that you were surprised, and a duty not to deny them the due process of even a step-one grievance for a 30-year employee fired for false reasons. The company would have to prove good cause and factually support the reasons for termination to an arbitrator under the familiar tests. Some say there's a seven-step, seven-factor test. What is absent from Mr. Haddock's declaration or their argument is how the information he possessed at the time would allow the employer to carry their burden of proof of showing just cause for termination. To conclude that the arbitration was unlikely to succeed is irrational under the facts in the light most favorable to Mr. Schramm. He was blindsided in what he thought was a call to discuss his return to work, defenseless in his termination, and left to find out in discovery of this lawsuit that the union was encouraging his termination. To find for the USW under these egregious facts is tantamount to blanket immunity for labor unions. If a member who was fired under these circumstances can't get help from his union, then we can bury the duty of fair representation on a scrap heap of history and render Vaca v. Sipes meaningless. Honorable judges, I urge you to draw the line and to find a balance. Help unions and members understand their respective rights and obligations. Both parties deserve no less, and Tom Schramm deserves a trial. Unless there are questions, I have nothing further. I appreciate the panel's attention. Thanks to both of you for your helpful briefs and oral arguments. We're really grateful. Thank you very much. Thank you. Case will be submitted, and the clerk may call the third case.